ATTORNEYS FOR PETITIONER:
**BENJAMIN A. BLAIR**
**DAVID A. SUESS**
**DANIEL R. ROY**
FAEGRE DRINKER BIDDLE &
REATH LLP
Indianapolis, IN

ATTORNEYS FOR RESPONDENT:
**JESSICA R. GASTINEAU**
**JOHN P. LOWREY**
OFFICE OF CORPORATION COUNSEL
Indianapolis, IN

**RAYMOND J. BIEDERMAN**
**SEAN P. BURKE**
**HAMISH S. COHEN**
**JEFFREY N. FURMINGER**
MATTINGLY BURKE COHEN &
BIEDERMAN, LLP
Indianapolis, IN

# IN THE
# INDIANA TAX COURT

CONVENTION HEADQUARTERS )
HOTELS, LLC, )
)
Petitioner, )
)
v. ) Cause No. 19T-TA-00021
)
MARION COUNTY ASSESSOR, )
)
Respondent. )

FILED
May 24 2024, 3:05 pm
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

## ON DIRECT APPEAL FROM THE INDIANA BOARD OF TAX REVIEW

**FOR PUBLICATION**
**May 24, 2024**

WENTWORTH, Senior J.

Convention Headquarters Hotels, LLC ("Convention HQ") claims the Marion County Assessor's 2010 assessment of its hotel, which was then under construction, violated its constitutionally guaranteed rights to equal protection, due process, uniformity and equality in assessment and taxation, and equal privileges and

immunities.  The essence of Convention HQ's argument is that the Assessor had a general practice of assessing some, but not all, commercial properties under construction in Marion County on the assessment dates between 2006 and 2019.  Upon review, the Court finds that the Assessor did assess all of these commercial properties under construction, and therefore, the 2010 assessment of Convention HQ's property did not violate its constitutionally guaranteed rights.

## FACTS

Convention HQ owns a 4.382-acre parcel of land in downtown Indianapolis, Center Township, Marion County, Indiana.  (See Trial Tr. Vol. 1 at 88-89;[1] Joint Stipulation of Facts ("Stip.") ¶¶ 1-2, Sept. 17, 2021;[2] Ex. P-1 at 2.)  The parcel is located in Marion County Tax District 101[3] and has been assigned the State Parcel Number 49-11-02-185-001.000-101 and the County Parcel Number 1055259 for identification and record-keeping purposes.  (See Stip. ¶¶ 1, 34; Ex. P-1 at 2.)  See also 50 IND. ADMIN. CODE 26-2-31 (2024) (defining the term "parcel number"); 50 IND. ADMIN. CODE 26-8-1 (2024) (regarding the parcel index numbering system for real property).

---

[1] The Court refers to the three-volume trial transcript as "Trial Tr. Vol. 1," "Trial Tr. Vol. 2," and "Trial Tr. Vol. 3."

[2] The Joint Stipulation of Facts comprises 98 distinct stipulations, alongside Stipulated Exhibits R-1 to R-23 and Stipulated Exhibits 1 to 61.  (Joint Stipulation of Facts ("Stip."), Sept. 17, 2021.) Rather than admitting these exhibits at trial, Exhibits P-1 to P-65 and P-67 were accepted into evidence, along with Stipulated Exhibits R-4 to R-11, R-21 to R-96, and R-98.  (See, e.g., Trial Tr. Vol. 1 at 3, 8-13; Trial Tr. Vol. 3 at 59-60, 130-31.)  All of the admitted exhibits were officially filed on January 24, 2022.

[3] A "tax district" is "[a] geographic area within which property is taxed by the same taxing units at the same total rate.  A taxing unit is an entity that has the power to impose ad valorem property taxes."  REAL PROPERTY ASSESSMENT GUIDELINES FOR 2002 – VERSION A (2004 Reprint) ("2002 Guidelines") (incorporated by reference at 50 IND. ADMIN. CODE 2.3-1-2 (2002) (repealed 2010)), Bk.2, Glossary at 20; REAL PROPERTY ASSESSMENT GUIDELINES FOR 2011 ("2011 Guidelines") (incorporated by reference at 50 IND. ADMIN. CODE 2.4-1-2 (2011) (amended 2020)), Glossary at 22.

In early 2008, the demolition of a Courtyard hotel on the parcel began, paving the way for the construction of several new facilities. (See Ex. R-4 at 154; Ex. R-7 at 172; Ex. R-91 at 2753-55.) Construction of the JW Marriott Indianapolis hotel began on May 27, 2008. (See Stip. ¶¶ 2, 25; Ex. R-23 at 254.) Anticipated to open in the first quarter of 2011, the JW Marriott included a 34-story glass tower, over 105,000 square feet of meeting space, an enclosed skyway leading to the Indiana Convention Center, and a multilevel underground parking garage. (See Ex. R-23 at 254-57; Ex. R-91 at 2679-80, 2776; Ex. R-96.)

For the 2009 tax year, the Assessor assigned Convention HQ's property an assessed value of $18,479,100.[4] (See, e.g., Ex. R-5.) He valued the land at $15,270,400, the pre-existing improvements[5] at $3,208,700, and the under-construction hotel at zero dollars ($0). (See Ex. R-29 at 1740; Trial Tr. Vol. 2 at 60-62; Trial Tr. Vol. 3 at 6-8.)

After conducting a site visit and reviewing certain valuation data, including the hotel's income and expense projections, the Assessor valued the land for the 2010 assessment date at $15,270,400. (See Exs. R-8 to R-11; Stip. ¶ 27.) He assigned percentage completion factors[6] of 40% and 70% to the incomplete buildings and

---

[4] Convention HQ filed a "protective appeal" to challenge its 2009 assessment, but that appeal is not at issue in this case. (Compare Ex. R-5 (Convention HQ's 2009 appeal forms) with Pet'r Pet. Jud. Rev. ¶ 6 (establishing that Convention HQ seeks relief for the 2010 tax year alone).)

[5] "Improvement" is a term of art that refers to buildings, fixtures, or appurtenances located on land, such as "fences, retaining walls, sidewalks, pavements, gutters, and tunnels." See IND. CODE § 6-1.1-1-15 (2024); REAL PROPERTY ASSESSMENT GUIDELINES FOR 2021 (incorporated by reference at 50 IND. ADMIN. CODE 2.4-1-2 (2021)), Glossary at 18.

[6] A "percentage completion factor" is a concept used in determining the assessed value of real property based on the progress of a construction or development project. (See ,e.g., Trial Tr. Vol. 1 at 89-92, 192-93; Ex. R-29 at 1740-43.)

skywalk, valuing them at $71,716,700.  (See Ex. R-29 at 1740-44; Stip. ¶¶ 27-28.)

Consequently, Convention HQ's assessment increased from $18,479,100 in 2009 to

$86,987,100 for the 2010 tax year.  (See Ex. R-29 at 1740-43; Stip. ¶ 27.)

**PROCEDURAL HISTORY**

On November 24, 2010, Convention HQ sought review of its 2010 assessment

with the Marion County Property Tax Assessment Board of Appeals (the "PTABOA"),

but the appeal languished with no discernable activity from the PTABOA for over six

years.  (See Stip. ¶ 14; Ex. R-21.)  See also Convention Headquarters Hotels, LLC v.

Marion Cnty. Assessor (CHH III), 132 N.E.3d 77, 79 (Ind. Tax Ct. 2019).  On June 6,

2017, Convention HQ transitioned its appeal to the Indiana Board of Tax Review.  Id.

Approximately a year later, Convention HQ filed direct appeals on two separate

occasions with this Court under Indiana Code Section 6-1.1-15-5(g).  Convention

Headquarters Hotels, LLC v. Marion Cnty. Assessor (CHH I), 119 N.E.3d 245 (Ind. Tax

Ct. 2019); Convention Headquarters Hotels, LLC v. Marion Cnty. Assessor (CHH II),

126 N.E.3d 80 (Ind. Tax Ct. 2019).  Convention HQ filed these appeals, arguing in each

that the maximum time for the Indiana Board to give notice of its final determination had

elapsed.  CHH I, 119 N.E.3d at 246-48; CHH II, 126 N.E.3d at 81-82.  In each instance,

however, the Court held that the appeal was commenced before the maximum time had

elapsed and remanded them to the Indiana Board to make its final determination.  CHH

I, 119 N.E.3d at 248-50; CHH II, 126 N.E.3d at 82-84.

On June 28, 2019, after the maximum time actually had elapsed, Convention HQ

initiated this direct appeal.  CHH III, 132 N.E.3d at 80.  Convention HQ asserted five

claims, alleging that the 2010 assessment of its partially constructed hotel violated the

4

Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution, its civil rights pursuant to 42 U.S.C. § 1983 (the "1983 Claim"), and the Property Taxation and Equal Privileges and Immunities Clauses of the Indiana Constitution.[7] Id. Twice thereafter, the Assessor unsuccessfully moved to dismiss Convention HQ's direct appeal. Id. at 80-84; Convention Headquarters Hotels, LLC v. Marion Cnty. Assessor, Case No. 19T-TA-00021 (Ind. Tax Ct. Sept. 23, 2019) (order denying the Assessor's second motion to dismiss).

In June of 2020, Convention HQ moved for partial summary judgment, claiming the Assessor had assessed only a few of the commercial buildings that were under construction between 2006 and 2019, including its own, which violated its federal and state constitutional rights.[8] Convention Headquarters Hotels, LLC v. Marion Cnty. Assessor (CHH V), 175 N.E.3d 1212, 1217-18 (Ind. Tax Ct. 2021). On August 5, 2021, the Court denied Convention HQ's motion, concluding that the case must proceed to trial because there was a genuine issue of material fact: whether all commercial properties under construction in Marion County between 2006 and 2019 had been assessed. Id. at 1221, 1229. The three-day trial was held and concluded on February 4, 2022.

---

[7] Convention HQ further alleged that the assessment of its land did not reflect its actual market value-in-use. Convention Headquarters Hotels, LLC v. Marion Cnty. Assessor (CHH V), 175 N.E.3d 1212, 1217 (Ind. Tax Ct. 2021). Convention HQ subsequently moved to bifurcate this valuation issue from the constitutional claims, which the Court granted. See id. Thus, this opinion resolves the constitutional issues alone, leaving the valuation of Convention HQ's land for subsequent resolution. (See Oral Arg. Tr. at 3.)

[8] The Assessor also filed a motion for partial summary judgment and Convention HQ moved to strike nearly all of the Assessor's designated evidence. Convention Headquarters Hotels, LLC v. Marion Cnty. Assessor (CHH IV), 173 N.E.3d 307, 310-11 (Ind. Tax Ct. 2021). The Court granted Convention HQ's motion to strike in part, (id. at 311-15), and denied the Assessor's motion for partial summary judgment in its entirety. See CHH V, 175 N.E.3d at 1223-29.

In presenting its case-in-chief, Convention HQ offered the testimony of Jeffrey A. Hill as an adverse witness. (Trial Tr. Vol. 1 at 13, 22-23, 42.) Mr. Hill served as the elected township assessor of Lawrence Township, Marion County, Indiana from 2007 through 2011. (See Trial Tr. Vol. 1 at 43-44.) From January 2009 through January 2021, he worked as a Commercial and Industrial Valuation Analyst ("Analyst") for the Assessor. (Trial Tr. Vol. 1 at 43-44.) Mr. Hill's Analyst duties required him to work primarily on property tax appeals and assessments of hotels, nursing homes, and apartments. (See Trial Tr. Vol. 1 at 43-48.) Mr. Hill was certified by the Department of Local Government Finance (the "DLGF") as a Level III Assessor-Appraiser, but he did not have any certifications or designations from the Appraisal Institute or the International Association of Assessing Officers. (Trial Tr. Vol. 1 at 45.)

In response, the Assessor offered testimony from both Hill and a current employee, Gabe Deaton. (See Trial Tr. Vol. 1 at 13-15; Trial Tr. Vol. 2 at 5-6, 198-200.) Mr. Deaton, a DLGF certified Level III Assessor-Appraiser, began his employment with the Marion County Assessor's Office in January 2009 as the Deputy Director of Residential Assessment, becoming the Director of Assessment in 2012. (See Trial Tr. Vol. 2 at 199-202, 206; Trial Tr. Vol. 3 at 52.) As the Director of Assessment, Mr. Deaton oversaw the assessment of all real property and business personal property in Marion County. (Trial Tr. Vol. 2 at 202.)

The Court conducted oral argument on July 14, 2022. Additional facts will be supplied as necessary.

**STANDARD OF REVIEW**

When the Indiana Board fails to enter a final determination within the maximum

6

time allowed by statute, the Tax Court hears the resulting direct appeal, authorized under Indiana Code Section 6-1.1-15-5(g), standing in the shoes of the Indiana Board and determines the matter de novo. See Rolls-Royce Corp. v. Marion Cnty. Assessor, 132 N.E.3d 522, 525 (Ind. Tax Ct. 2019); IND. CODE § 6-1.1-15-5(g) (2024).

**LAW**

Indiana's Constitution states that "the General Assembly shall provide, by law, for a uniform and equal rate of property assessment and taxation and shall prescribe regulations to secure a just valuation for taxation of all property, both real and personal." IND. CONST. art. 10, §1(a). The General Assembly mandated that "all tangible property . . . [in Indiana] on the assessment date of a year is subject to assessment and taxation for that year." IND. CODE § 6-1.1-2-1 (2024). "[T]he annual assessment date for tangible property is: (1) March 1 in a year ending before January 1, 2016; and (2) January 1 in a year beginning after December 31, 2015." IND. CODE § 6-1.1-2-1.5(a) (2024). Consequently, all real property must be annually assessed and taxed, including all improvements to real property that may be under construction on the assessment date. See, e.g., Jones v. Jefferson Cnty. Assessor, 51 N.E.3d 461, 463-64 (Ind. Tax Ct. 2016) (upholding the assessment of a residence that was under construction on two different assessment dates).

During the 2006 through 2019 tax years, Indiana used a mass appraisal system that valued real property using a cost approach appraisal methodology. See, e.g., Piotrowski BK #5643, LLC v. Shelby Cnty. Assessor, 177 N.E.3d 127, 131 (Ind. Tax Ct. 2021); Gillette v. Brown Cnty. Assessor, 54 N.E.3d 454, 456 (Ind. Tax Ct. 2016). The resulting valuation represented the property's "market value-in-use," which is defined as

the value "of a property for its current use, as reflected by the utility received by the owner or a similar user, from the property."  See 2002 REAL PROPERTY ASSESSMENT MANUAL (2004 Reprint) ("2002 Manual") (incorporated by reference at 50 IND. ADMIN. CODE  2.3-1-2 (2002) (repealed 2010)) at 2; 2011 REAL PROPERTY ASSESSMENT MANUAL ("2011 Manual") (incorporated by reference at 50 IND. ADMIN. CODE 2.4-1-2 (2011) (amended 2020)) at 2.  To determine a property's market value-in-use, Indiana assessing officials rely on a series of assessment guidelines that describe in detail the application of the cost approach.  See, e.g., REAL PROPERTY ASSESSMENT GUIDELINES FOR 2002 – VERSION A (2004 Reprint) ("2002 Guidelines") (incorporated by reference at 50 I.A.C. 2.3-1-2), Bks. 1 & 2; REAL PROPERTY ASSESSMENT GUIDELINES FOR 2011 ("2011 Guidelines") (incorporated by reference at 50 I.A.C. 2.4-1-2); 2011 Manual at 3.

**ANALYSIS**

Convention HQ claims that by assessing its under-construction property, but not assessing most of the other under-construction commercial properties in Marion County between 2006 and 2019, the Assessor violated its federal and state constitutional rights. (See, e.g., Pet'r Post-Trial Br. ("Pet'r Br.") at 1, 17-53.)  These rights are protected under the United States Constitution's equal protection and due process clauses[9] and the Indiana Constitution's equal privileges and immunities and property taxation

---

[9]  The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that "[n]o State shall . . . deny to any within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV, § 1.  The Due Process Clause of the Fourteenth Amendment to the United States Constitution guarantees that no state shall "deprive any person of life, liberty, or property, without due process of law[.]"  Id.

clauses.[10]  (See, e.g., Pet'r Br. at 1, 17-53.)  Convention HQ asks the Court to remedy these violations by assigning a zero-dollar value to its hotel improvements that were under construction on the 2010 assessment date, thus aligning its liability with that of other Marion County properties under construction on that date.  (See Pet'r Br. at 53-56; Pet'r Post-Trial Reply Br. ("Pet'r Reply Br.") at 27-28.)  In addition, Convention HQ seeks an award of its costs, fees, expenses, and reasonable attorney's fees under its 1983 Claim.  (See Pet'r Br. at 39-43; Pet'r Pet. Jud. Rev. at 14.)

In response, the Assessor maintains that Convention HQ is not entitled to relief because the evidence does not show that he failed to assess similarly situated Marion County properties under construction or that his assessments were arbitrary.  (See Resp't Post-Trial Br. ("Resp't Resp. Br.") at 1-2, 21-63.)  The Assessor states that he adhered to Indiana's assessment laws and his office's policy to assess all commercial improvements based on their market value-in-use, regardless of construction status.  (See Resp't Resp. Br. at 21, 25-41.)  He further maintains that the totality of the evidence supports his position, in contrast to Convention HQ's cherry-picked evidence and misleading references to zero-dollar valuations.  (See, e.g., Oral Arg. Tr. at 57-76.)

The factual question that paves the way for the Court to resolve Convention HQ's constitutional claims of disparate treatment is whether all commercial properties under construction in Marion County between 2006 and 2019 were actually assessed.  To

---

[10] The Indiana Constitution Equal Privileges and Immunities Clause states that "[t]he General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms, shall not equally belong to all citizens."  IND. CONST. art. 1, § 23.  The Property Taxation Clause of the Indiana Constitution states that "the General Assembly shall provide, by law, for a uniform and equal rate of property assessment and taxation and shall prescribe regulations to secure a just valuation for taxation of all property, both real and personal."  IND. CONST. art. 10, § 1(a).

9

answer this question, the evidence must demonstrate (1) which commercial properties were under construction in Marion County during that period; and (2) whether all of these properties were "assessed." If not, there can be no disparate treatment based on assessment versus non-assessment. If so, the Court will apply the facts to the individual elements of each constitutional claim.

## I. Properties Under Construction

The parties do not dispute that the JW Marriott hotel was under construction on the 2010 assessment date. (See, e.g., Stip. ¶ 25; Ex. R-23 at 254; Ex. R-91 at 2679-80 (indicating that the construction of the hotel extended from May 2008 through February 2011).) Additionally, the parties have stipulated that 62 other commercial properties (the "62 Stipulated Properties") were under construction in Marion County at some point during 2006 through 2019. (See Second Joint Stipulation of Facts ("Second Stip.").)

The parties disagree, however, on the number of commercial properties that were under construction in Marion County between 2006 and 2019. Convention HQ claims that the 62 Stipulated Properties represent the universe of properties similarly situated to the JW Marriott, describing them as "properties with the same use in the same taxing district."[11] (See Oral Arg. Tr. at 13.) The Assessor offered a different perspective, arguing that many other commercial properties, in addition to the 62 Stipulated Properties, were under construction in Marion County during that period. (See Trial Tr. Vol. 3 at 40-48, 203-04; Resp't Resp. Br. at 8-9.)

In support of his argument, the Assessor provided Exhibit R-28, a 1,319-page

---

[11] At trial, the parties disagreed about whether each of the 62 Stipulated Properties was similarly situated to Convention HQ's hotel. (See, e.g., Trial Tr. Vol. 3 at 196-204.) The Court does not address this issue, resolving the case on other grounds.

10

exhibit containing 362 property record cards for 147 distinct commercial properties - each listing percentage completion factors for one or more of the 2007 through 2012 tax years. (See Ex. R-28; Trial Tr. Vol. 3 at 40-41.) Apparently, the Assessor offered Exhibit R-28 to suggest that all commercial properties with a completion factor on their property record cards were under construction on an assessment date. Mr. Deaton, who prepared the exhibit, testified about the percentage completion factors assigned to some of the properties between 2008 and 2010. (See Trial Tr. Vol. 3 at 40-46.) He also testified that two of the properties, Parcels 1033841 and 1034218, were under construction respectively in 2007 and 2010. (See Trial Tr. Vol. 3 at 64-65.)

Upon review, most of the 362 property record cards in Exhibit R-28 indicate a range of completion between 1% and 99%, more than 60 indicate 100% completion, and approximately 20 indicate 0% completion. (See Ex. R-28.) Furthermore, some of the property record cards in Exhibit R-28 contained additional information, such as:

(1) six condominiums, newly built in 1985, each had percentage completion factors assigned for the tax years 2007, 2008, 2009, 2011, and 2012 that exactly corresponded with each property's ownership "interest in [the] common property";[12]

(2) the improvements on four parcels – an apartment complex, a full-service bank, a retail establishment, and an auto sales and service center[13] – were built years before 2012, and had percentage completion factors on their property record cards of

---

[12] The 2010 property record cards for the condominium properties and several other properties were omitted from Exhibit R-28 without explanation. (See, e.g., Trial Tr. Vol. 3 at 137-39; Ex. R-28.)

[13] For assessment purposes, "[c]ommercial properties are classified by [p]roperty [c]lass codes beginning with the number 4 under the [DLGF's] Property Tax Management System Code List Manual[.]" (See Stip. ¶ 31; Trial Tr. Vol. 1 at 83-86.) See also 2002 REAL PROPERTY ASSESSMENT MANUAL (2004 Reprint) ("2002 Manual") (incorporated by reference at 50 I.A.C. 2.3-1-2), App. A at 23-24; 2011 REAL PROPERTY ASSESSMENT MANUAL ("2011 Manual") (incorporated by reference at 50 I.A.C. 2.4-1-2), App. A at 16-17 (providing over 50 property class codes for commercial property).

11

100% between 2007 and 2012;

(3) the structures on Parcel 1033841 and three other properties were constructed before 2007, but each contained a percentage completion factor of 0% between 2007 and 2012;

(4) the improvements on three parcels, newly constructed between 1890 and 1990, had percentage completion factors ranging from 40% to 90%; and

(5) five of the 62 Stipulated Properties (i.e., Parcels 1019816, 1057613, 3023511, 7046028, and 9011580) were included in Exhibit R-28.

(See Trial Tr. Vol. 3 at 140-75.)  (See also Ex. R-28 at 428-29, 436-37, 444-81 524-35, 548-62, 577-78, 588-96, 665-87, 996-1005, 1108-59, 1186-88, 1335-38, 1465-76, 1495-1510, 1728-35; Second Stip. at 2-4.)  Thus, this evidence shows that property record cards with a percentage completion factor could indicate a variety of things:  that a property is under construction on the assessment date, a taxpayer's ownership interest in a condominium property, that the construction is 100% complete, that the percentage completion factor was used to reduce the assessed value of completed improvements, or that it simply could be a mistake.  Indeed, Mr. Hill admitted that it is possible for the Assessor to have mistakenly ascribed a percentage completion factor to finished improvements or to assign an incorrect percentage completion factor to a property under construction.  (See Trial Tr. Vol. 1 at 89-99.)

Accordingly, the Assessor's evidence in Exhibit R-28 does not show that a property record card with a percentage completion factor necessarily indicates that the property was under construction on the relevant assessment dates.  The Assessor could have presented additional evidence, as was done for the 62 Stipulated Properties, to corroborate his claim that all the Exhibit R-28 properties were assigned completion

12

percentages because they were under construction between 2007 and 2012.  (See, e.g., Exs. R-25 to R-26 (images of construction activity for 26 of the 62 Stipulated Properties).)  (See also, e.g., Trial Tr. Vol. 1 at 96 (where Mr. Hill states "it would behoove someone to do a further analysis in reviewing aerial photography at the time of the valuation date to confirm what's on the property record card").)  The Assessor failed to do so.  (See, e.g., Trial Tr. Vol. 3 at 186-91.)  Therefore, the Court finds that the JW Marriott and the 62 Stipulated Properties were the only commercial properties under construction in Marion County between 2006 and 2019.

## II.  Assessment

Convention HQ asserts that the property record cards disclose that the Assessor treated it differently by assessing its under-construction commercial hotel, while not assessing most of the other commercial properties under construction in Marion County during the relevant years. (See, e.g., Pet'r Br. at 17-26.)  Initially, therefore, Convention HQ must prove that the Assessor failed to assess most of the commercial properties under construction.  To meet this burden, Convention HQ focused on the meaning of the term "assessment" as it is used for Indiana property tax assessment purposes. (See Pet'r Br. at 25-26; Oral Arg. Tr. at 16-17.)

From the 2006 through the 2019 tax years, Indiana's 2002 and 2011 Real Property Assessment Manuals (the "Manuals") consistently defined "assess" as "[t]o value property officially for the purpose of taxation."  2002 Manual at 8; 2011 Manual at 4.  The Manuals also defined an "assessment" as "the official acts of determining the amount of the tax base."  2011 Manual at 4 (emphasis added); see also 2002 Manual at 8.  Specifically, the official acts for making an "assessment" for property tax purposes

13

were described as: "<u>discovering, listing , and appraising property</u>, whether performed by an assessor, property tax assessment board of appeals or a court."  2002 Manual at 8 (emphasis added); 2011 Manual at 4 (emphasis added).  Even though Convention HQ conceded that the Assessor completed the first official requirement for making an assessment by "discovering" properties under construction,[14] it maintains that the Assessor failed to perform the other two official requirements of "listing" <u>and</u> "appraising" property.  (<u>See</u> Pet'r Br. at 18-26; Pet'r Reply Br. at 1-3; Oral Arg. Tr. at 16-29.)

## A. Listing

Convention HQ contends that the evidence shows the Assessor did not assess most of the under-construction properties because the incomplete improvements were not "listed on the property record cards nor on the assessment rolls."  (Pet'r Br. at 26; <u>see also</u> Oral Arg. Tr. at 19-23.)  In the assessment context, the official act of "listing" is a required element for the assessment of property, but its definition does not appear in either the Manuals or the related assessment Guidelines.  <u>See</u> 2002 Manual at 10; 2011 Manual at 5; 2002 Guidelines at 11, Bk. 2, Glossary; 2011 Guidelines, Glossary at 13. Neither does the Indiana Code contain a direct definition; it simply provides that

> [a]ssessing officials shall: (1) comply with the rules, appraisal
> manuals, bulletins, and directives adopted by the [DLGF]; (2) use
> the property tax forms, property tax returns, and notice forms
> prescribed by the [DLGF]; and (3) collect and record the data
> required by the [DLGF].

IND. CODE § 6-1.1-31-5(b) (2006).

---

[14]  During oral argument, Convention HQ appeared to retreat from its concession, arguing that the Assessor could not prove that some of the properties were discovered due to a lack of corroborating evidence.  (<u>See</u> Oral Arg. Tr. at 17-19.)  The Court, however, gives this <u>unsupported</u> argument no weight.

Convention HQ claims that this statute obligates assessing officials to "list" the incomplete improvements on property record cards or assessment rolls. (See Oral Arg. Tr. at 21-23.) Moreover, Convention HQ urges the Court to construe the meaning of "listing" by referring to the definition of the related noun "lister" found in Indiana's assessment Guidelines.[15] (See Oral Arg. Tr. at 19-23.)

The Guidelines define "lister" as "[a] field inspector whose principal duty is to collect and record property data." See 2002 Guidelines, Bk. 2, Glossary at 11; 2011 Guidelines, Glossary at 13. This provision indicates that assessing officials must collect and record property data, as does Indiana Code Section 6-1.1-31-5(b) above. Neither authority, however, specifies the precise data to be collected or where that data is to be recorded. The Guidelines designate an "assessment roll" or "tax duplicate" as "[t]he official listing of all properties within a given taxing jurisdiction by ownership, description, and location showing the corresponding assessed value for each." 2002 Guidelines, Bk. 2, Glossary at 2 (emphasis added); 2011 Guidelines, Glossary at 3 (emphasis added). Furthermore, Indiana Code Section 6-1.1-22-3 requires the preparation of tax duplicates that include property data "before March 15 of each year[.]" See IND. CODE § 6-1.1-22-3(a) (2024). These authorities state the specific property data to be collected and the appropriate recording location. In light of this, Convention HQ's argument is unconvincing for the following reasons.

First, while the authorities require assessing officials to gather and document

---

[15] While neither party has defined the term listing, the International Association of Assessing Officers (the "IAAO"), an organization that has provided other definitions used in Indiana's property tax assessment system, has defined "listing" as the act of "preparing and certifying the assessment roll of the entire jurisdiction." INT'L ASS'N OF ASSESSING OFFICERS, PROPERTY ASSESSMENT VALUATION 2 (2nd ed. 1996); see also 2002 Manual at 8 (indicating that some of the definitions in the 2002 Manual were derived from an IAAO publication).

specific property data on <u>assessment rolls</u> for "listing" purposes, they do not explicitly or implicitly state that the data must be recorded on property record cards. <u>See, e.g.</u>, <u>Riley-Roberts Park, LP v. O'Connor</u>, 186 N.E.3d 162, 169-74 (Ind. Tax Ct. 2022), <u>review denied</u>; <u>Osolo Twp. Assessor v. Elkhart Maple Lane Assocs., L.P.</u>, 789 N.E.2d 109, 112 (Ind. Tax Ct. 2003) (collectively indicating that the Court has no power to limit or extend the operation of unambiguous statutes or regulations). In fact, Convention HQ has not provided any authority establishing that the official act of "listing" involves documenting property data on property record cards.

Second, Convention HQ – the party with the burden of proof – has not provided evidence to substantiate its claim that "listing" includes recording specific data about under-construction improvements on assessment rolls or property record cards. Even if this recordation were required, Convention HQ did not provide any assessment rolls or tax duplicates as evidence to demonstrate that the Assessor did not list data regarding incomplete improvements on them as part of his assessment. (<u>See</u> Oral Arg. Tr. at 20 (where Convention HQ acknowledges that assessment rolls were not admitted into evidence).) Consequently, Convention HQ has not met its burden to prove that the Assessor failed to assess most of the properties under construction by not listing their under-construction improvements on the assessment rolls or property record cards.

### B. Appraising

Convention HQ also claims that the Assessor failed to assess 55 of the 62 Stipulated Properties because the Assessor failed to appraise them. (<u>See</u> Pet'r Br. at 17-18, 26.) Assessment requires the official act of appraising a property, which is "[t]he act of estimating the money value of property." <u>See</u> 2002 Manual at 8; 2011 Manual at

16

4. Convention HQ asserts that

> [t]he substantial majority of properties that were under construction on an assessment date <u>did not have an assessed value assigned to the improvements</u> that were being built. Over more than a decade, excluding the Subject Property, 87.5% of under-construction hotels in District 101, 82.6% of under-construction hotels in Marion County, and 91.5% of under-construction commercial properties in District 101 had no value assessed to their improvements, and their owners paid no taxes on their under-construction buildings.

(Pet'r Br. at 18 (emphasis added).) Convention HQ corroborates its claim that most of the properties under construction were not appraised, and thus not assessed, based on: (1) a judicial admission, (2) the property record cards, and (3) the lack of retroactive assessments. (See, e.g., Pet'r Br. at 24; Pet'r Reply Br. at 2; Oral Arg. Tr. at 28-42.)

**1. Judicial Admission**

Convention HQ argues that the Assessor made a binding judicial admission during the trial by acknowledging that he did not assess most of the under-construction properties within his jurisdiction due to a lack of information about the improvements. (See Oral Arg. Tr. at 28-29; Pet'r Br. at 19-22.) A judicial admission is a voluntary and knowing concession of fact made by a party or the party's attorney in a current pleading or during the course of trial; "'it is conclusive upon the party making it and relieves the opposing party of the duty to present evidence on that issue.'" See Bank v. Huizar, 178 N.E.3d 326, 336 (Ind. Ct. App. 2021) (citation omitted); Stewart v. Alunday, 53 N.E.3d 562, 568-69 (Ind. Ct. App. 2016). That said, if a statement contains ambiguities or creates doubt, it is not a binding judicial admission. Bank, 178 N.E.3d at 336; Stewart, 53 N.E.3d at 568-69.

At trial, Mr. Hill testified that "[i]f you do not have a minimum amount of information, primarily the property characteristics, you can assess the [incomplete]

17

improvements at [a] market value[-]in[-]use of zero." (Trial Tr. Vol. 2 at 194.) Mr. Hill further opined that an assessor may value unfinished improvements at zero dollars if he "doesn't have certain basic information about a property improvement[.]" (See Trial Tr. Vol. 2 at 26-27, 50.) Likewise, Mr. Deaton testified that when non-zero values for under-construction improvements could not be determined, it was "appropriate" to give the improvements a zero-dollar value. (See Trial Tr. Vol. 3 at 19-20.) Convention HQ contends that the statements by Marion County assessing officials constitute concessions by the Assessor. (See Oral Arg. Tr. at 28-29.) Convention HQ claims the Assessor could not assign a positive value to, and therefore could not assess, most of the 62 Stipulated Properties because "[s]aying I can't do something is the same as saying I didn't do it because by definition . . . you didn't do something that you can't do." (See Oral Arg. Tr. at 28-29; Pet'r Reply Br. at 23-24.)

Both Mr. Hill and Mr. Deaton made their statements voluntarily and knowingly, but they were not, as Convention HQ claims, binding judicial admissions that concede the Assessor failed to assess most of the under-construction properties. Rather, their statements were part of extensive explanations about why incomplete improvements would be intentionally assigned a zero-dollar estimated value. Moreover, Convention HQ did not provide any legal authority prohibiting Indiana assessing officials from assigning a zero-dollar value to under-construction improvements. Therefore, Convention HQ has not established that the Assessor made a binding judicial admission that he did not assess 55 of the 62 Stipulated Properties due to a lack of information.

### 2. Property Record Cards

Convention HQ also claims that the lack of specific information on most of the

property record cards for the under-construction properties confirms that the Assessor failed to assess them. (See, e.g., Pet'r Br. at 18-26.) During the trial, the parties submitted more than 150 property record cards containing information about all the under-construction properties (the subject property and the 62 Stipulated Properties) in Marion County between 2006 and 2019.[16] (See Exs. P-1 to P-61; Exs. R-29 to R-89.)

Property record cards are public records prepared by assessing officials that display a variety of information about each particular property. (See Stip. ¶ 29.) Generally, the first page of a property record card includes details about the entire property, such as the parcel number, tax district, address, ownership, property class code, market value-in-use, land acreage or square footage, the land's base rate and classification, and notes made by assessing officials. See, e.g., 2011 Guidelines, Ch. 6 at 19-22. The subsequent pages provide information about the improvements, such as physical attributes, applicable base rates and adjustments, and other details about the improvements. See id.

Throughout this litigation, Convention HQ primarily rooted its claims of non-assessment on the lack of information regarding incomplete improvements and the assignment of zero-dollar values on property record cards:

> The property record cards are replete with zero improvement values – which is the "default," – and no sketches, measurements, or details of any kind. There is simply no documentary evidence – despite thousands of pages of proffered assessment records – that the zero values for under-construction buildings were developed considering any [Guidelines]-based or market-based information. Rather, the zero values, coupled with the complete absence of any indication that the under-construction improvements were assessed, and the lack of any change in property record cards from

---

[16] The Assessor also submitted a few property record cards for the 2020 and the 2021 tax years. (See Ex. R-32 at 1779-85; Ex. R-37 at 1876-83; Ex. R-55 at 2094-97; Ex. R-68 at 2319-22.)

pre-construction to during-construction, are strong evidence that the properties were not assessed.

(Pet'r Reply Br. at 2 (citation omitted).)  (See also Pet'r Br. at 18-26.)  Convention HQ

has further explained that the

evidence of non[-]assessment was not limited to the zero itself on [the] property record cards, although that is part of [the] evidence. There is also . . . the lack of sketches, measurements, improvement characteristics, comments on the property record card[s], comments in the CAMA system,[17] indicating that a valuation under the [G]uidelines or something else, any other market data was undertaken, [and] there is a lack of any indication that there were under[-]construction improvements on those parcels.

(Oral Arg. Tr. at 41 (footnote added).)  Thus, Convention HQ's claim of non-assessment

from the lack of information reported on the property record cards focuses specifically

on:  (a) zero-dollar valuations and the absence of physical characteristics for incomplete

improvements, (b) the absence of sketches, (c) inferences drawn from certain notations,

and (d) the lack of pre- and post-completion changes.

**(a) Zero-dollar Valuations and Physical Characteristics**

Convention HQ claims a zero-dollar valuation on a property record card is

ambiguous because it is not necessarily the result of an Assessor's deliberate estimate

of value, but could be the result of a carryover default value or an intentional or

accidental failure to assess.  (See Oral Arg. Tr. at 16, 35-36, 50; Pet'r Br. at 19, 24.)

Therefore, Convention HQ maintains that the Assessor must resolve this ambiguity with

corroborating evidence.  (See Pet'r Br. at 19, 25-26; Oral Arg. Tr. at 50.)  Here,

---

[17]  Between 2006 and 2019, the Assessor used a property tax assessment software tool known as the Computer Assisted Mass Appraisal (CAMA) system to collect, record, store, and produce a variety of assessment-related data, such as digital images, notes, aerial photographs, valuation data, and property record cards.  (See Third Joint Stipulation of Facts ¶¶ 1-3; Trial Tr. Vol. 1 at 55-58, 140-43; Trial Tr. Vol. 2 at 20-22, 208-10.)

however, none of the property record cards at issue have details about the physical characteristics of under-construction improvements. (See Pet'r Br. at 19, 26.) Moreover, Convention HQ also notes that the Assessor merely provided post hoc justifications rather than evidence to show that the zero-dollar valuations were derived from applying the Guidelines' cost approach or some other verifiable market data.[18] (See Pet'r Br. at 18-25.)

Convention HQ's arguments assume that an incomplete improvement with a zero-dollar valuation was not assessed. This assumption is unfounded. The Indiana Constitution "requires the General Assembly to provide for a system of assessment and taxation characterized by uniformity, equality and just valuation based on property wealth, but [it] does not require absolute and precise exactitude as to the uniformity and equality of each individual assessment." State Bd. of Tax Comm'rs v. Town of St. John, 702 N.E.2d 1034, 1040 (Ind. 1998) (emphasis added). Moreover, the DLGF, as the administrative agency responsible for ensuring uniform and equal assessments in Indiana, has promulgated assessment guidelines that contain procedures and schedules for determining the market value-in-use of real property under the cost approach.[19] See, e.g., IND. CODE §§ 6-1.1-30-1.1 to -17 (2024); 2002 Guidelines, Bks. 1

---

[18] Convention HQ alternatively claims that the improvements' zero-dollar valuations were incorrect because most of them "had progressed beyond the 'hole-in-the-ground' stage of construction" and necessarily were worth more than zero-dollars. (See Pet'r Post-Trial Br. at 24-25; Pet'r Post-Trial Reply Br. at 10-13.) This claim is a red herring. Convention HQ, the party with the burden of proof, did not present any market data to establish that the zero-dollar valuations were actually incorrect. See, e.g., Jones v. Jefferson Cnty. Assessor, 51 N.E.3d 461, 463-64 (Ind. Tax Ct. 2016) (providing that litigants must present market-based, objective evidence that indicates an assessment is not an accurate reflection of a property's market value-in-use).

[19] The 2002 Guidelines were promulgated by the Department of Local Government Finance's predecessor, the State Board of Tax Commissioners. Eckerling v. Wayne Twp. Assessor, 841 N.E.2d 674, 676 (Ind. Tax Ct. 2006).

21

& 2; 2011 Manual at 3.  The Guidelines, however, are not designed to account for every

conceivable assessment scenario:

> Although th[e] assessment manual provides general rules for
> assessing property, situations may arise that are not explained or
> that result in assessments that may be inconsistent with [Indiana's
> market value-in-use standard].  In those cases[,] the assessor shall
> be expected to adjust the assessment to comply with th[e market
> value-in-use standard.]

2002 Manual at 2.  Rather than rigidity, the DLGF incorporated flexibility into the

Guidelines by empowering assessing officials to choose the most appropriate tools for

determining the market value-in-use of real property when the need arises.

This flexibility is particularly evident when comparing the methodologies for

assessing incomplete residences and incomplete commercial improvements.

Specifically, the Guidelines include a table that assigns specific percentages to

construction tasks, reflecting their contribution to the overall completion of a typical

average quality single-family residence:

| | | |
|---|---|---|
| 1. | Excavation, forms, water/sewage hook up, and concrete | 14% |
| 2. | Rough framing | 21% |
| 3. | Windows, exterior door, and floor cover | 5% |
| 4. | Rough-in plumbing, insulation, and electrical service | 16% |
| 5. | Exterior | 6% |
| 6. | Interior drywall and ceiling finish | 8% |
| 7. | Built-in cabinets, interior doors, trim, etc. | 13% |
| 8. | Plumbing fixtures | 5% |
| 9. | Floor covers and built-in appliances | 6% |
| 10. | Light fixtures, painting, and decorating | 6% |
| | TOTAL | 100% |

2002 Guidelines, Bk. 1, App. C at 5; 2011 Guidelines, App. C at 5.  This table provides

a methodology for determining the value of an incomplete residence at different stages

of construction.

In contrast, the Guidelines do not include a similar table for incomplete commercial improvements, nor do they provide a specific methodology for assessing these properties.  See 2002 Guidelines, Bk. 2, Ch. 6 and Apps. D-G; 2011 Guidelines, Ch. 6 and Apps. D-G.  Instead, the Guidelines for commercial properties provide the necessary concepts[20] for assessing a finished commercial improvement under the cost approach and applicable cost schedules.[21]  See 2002 Guidelines, Bk. 2, Ch. 6 at 4-59; 2011 Guidelines, Ch. 6 at 4-58 and Apps. D-G.  (See also Trial Tr. Vol. 2 at 34-37, 108-10, 142-46, 217-18 (explaining that the percentage completion table for residences generally does not apply to incomplete commercial improvements due to the properties' inherent differences).)  Therefore, assessing officials have and must use greater discretion in estimating the value of unfinished commercial improvements than for incomplete residential improvements.  The trial evidence bears this out.

At trial, Mr. Deaton explained that the duration of construction for commercial properties can be greatly influenced by a wide array of factors, such as the complexity of the improvement, its size, and external conditions, leading to substantially varied schedules.  (See Trial Tr. Vol. 2 at 222-24; Trial Tr. Vol. 3 at 29-30.)  Moreover,

---

[20]  In general, the concepts are described as follows:  (1) sketching a structure; (2) measuring and calculating areas; (3) using the general commercial models; (4) using schedules; (5) understanding base rates for floor levels; (6) determining a structure's finish type, use type, wall type, and construction type (7) using a structure's floor height; (8) understanding the perimeter-to-area ratio for a structure; (9) understanding vertical and horizontal costs; and (10) determining the number of property record cards to use for a parcel.  2002 Guidelines, Bk. 2, Ch. 6 at 4; 2011 Guidelines, Ch. 6 at 4.

[21]  The cost schedules provide standardized estimates of construction costs for different types of commercial structures, based on the latest industry data.  See, e.g., 2002 Guidelines, Bk. 1, Intro. at 1-2.  These schedules consider a variety of factors including, but not limited to, the cost of labor and materials, the type of construction (e.g., wood frame, steel frame, or concrete), and the size and shape of the structure.  See e.g., 2002 Guidelines, Bk. 1, Intro. at 1-2 and Bk. 2 at App. G.

23

applying a percentage completion factor between 1% and 99% and estimating the corresponding positive dollar value is appropriate only when an assessing official can estimate the value of an improvement as if it were 100% complete.  (See, e.g., Trial Tr. Vol. 1 at 89-92, 192-93; Trial Tr. Vol. 3 at 28-30.)  (See also Ex. P-67 at 49-51.)

Mr. Deaton clarified that when Marion County assessing officials could not project the completed value of an unfinished improvement due to missing information, such as its use, framing, or wall types, they would intentionally estimate the unfinished value to be zero dollars.  (See Trial Tr. Vol. 2 at 26-27, 36-39.)  See also, e.g., 2011 Guidelines, Ch. 6 at 14 (discussing use and wall types), 17-18 (discussing framing types).  He further explained that it would be improper to assign a positive value to unfinished improvements lacking those basic details because the value would "go from [being] an estimate to being a guess."  (See Trial Tr. Vol. 2 at 50.)  (See also Trial Tr. Vol. 1 at 82-86 (explaining that the Guidelines are the primary source of the information presented on the property record cards).)  Consequently, under this methodology, Marion County assessing officials routinely determined that an incomplete improvement had no contributory value under the cost approach when its condition rendered the Guidelines' cost schedules inapplicable.  Stated differently, the Assessor used discretion to adjust an assessment when estimating an unfinished property's value.

A review of the property record cards for the eight properties Convention HQ believes were assessed best illustrates this approach.  (See Oral Arg. Tr. at 35-36 (where Convention HQ asserts that the incomplete improvements with non-zero values were assessed).)  The property record cards for these eight properties indicate that their incomplete improvements were assigned completion factors ranging from 50% to 85%,

and five of the properties were under construction on multiple assessment dates.[22] (See Ex. P-1; Ex. P-8A; Ex. P-13A; Ex. P-20A; Ex. P-23A; Ex. P-31A; Ex. P-43A; Ex. P-61A; Second Stip.)  The property record cards further show that all under-construction improvements had an estimated value of zero dollars and lacked details reporting physical characteristics in the first year of a multi-year construction project.  (See Ex. P-1; Ex. P-8A at 61-64; Ex. P-31A at 239-40; Ex. P-43A at 352-55; Ex. P-61A at 2-3.) When a percentage completion factor was initially assigned, the incomplete improvements were "deemed" fully built, and specific details about them (e.g., their measurements, applicable pricing keys, and use types) were recorded on the property record cards.  (Compare Ex. P-1; Ex. P-8A at 65-66; Ex. P-31A at 241-44; Ex. P-43A at 356-59; Ex. P-61A at 4-7 with Ex. P-8A at 61-64; Ex. P-31A at 239-40; Ex. P-43A at 352-55; Ex. P-61A at 2-3.)  The property record cards did not indicate, however, which portions of the improvements remained incomplete or provide a benchmark for determining when a non-zero-dollar valuation is required.  (Compare Ex. P-1; Ex. P-8A at 65-66; Ex. P-31A at 241-44; Ex. P-43A at 356-59; Ex. P-61A at 4-7 with Ex. P-8A at 61-64; Ex. P-31A at 239-40; Ex. P-43A at 352-55; Ex. P-61A at 2-3.)  Thus, these property record cards confirm two things.  First, the final estimated values and recording of the physical characteristics of improvements on property record cards depended entirely on visible design features as of the statutorily prescribed assessment date. Second, the point in time when estimated values and improvement characteristics were

---

[22]  Even though the subject property was under construction in 2009 and 2010, the 2009 property record card for the subject property is not in evidence.  (See Ex. P-1; Ex. R-29.) Nonetheless, the 2010 property record card indicates that the under-construction improvements were valued at $0 in 2009, and pre-existing improvements were valued at $3,208,700.  (See Ex. P-1 at 2.)

25

recorded on the property record cards was based on when the visible design features justified the use of percentage completion factors greater than 0%, a decision that was made subjectively.

While the parties offered photographic evidence for all of the properties at issue, the dates of the photographs do not align with any relevant assessment date and primarily depict the exteriors of the structures, not the interiors.  (See Exs. P-1B to Ex. P-61B; Exs. R-25 and R-26.)  Thus, the photographs do not accurately represent how the unfinished improvements looked on a specific assessment date.  Additionally, even though the parties stipulated that the construction periods related to one or more of the specific 2006 to 2019 assessment dates, the trial evidence failed to show precisely when each construction project began or ended.  (Compare, e.g., Exs. P-1 to P-61 with Second Stip.)  Given the misaligned photographic evidence, the depictions of just the exteriors of the unfinished improvements, and the lack of precise construction timeline information, this evidence does not establish a correlation between placing descriptions of the unfinished improvements on the property record cards and any specific assessment date.  Without that link, Convention HQ has failed to prove that the Assessor did not appraise, or estimate the value, of most of the under-construction properties based on their zero-dollar valuations and missing physical characteristics on their property record cards.

The Guidelines do not prohibit an assessor from appraising unfinished improvements at a zero-dollar value when design features are not discernible on the assessment date.  See 2002 Guidelines, Bk. 2, Ch. 6; 2011 Guidelines, Ch. 6.  Moreover, they do not require assessing officials to document the physical

26

characteristics of unfinished improvements on property record cards, even when those characteristics are ascertainable. See 2002 Guidelines, Bk. 2, Ch. 6; 2011 Guidelines, Ch. 6. Consequently, the Court finds that the presence of zero-dollar valuations and the absence of physical characteristics regarding unfinished improvements on property record cards does not prove the Assessor failed to appraise these properties during ongoing construction.

### (b) Sketches

Convention HQ claims that the lack of building sketches on the property record cards of 55 of the 62 Stipulated Properties indicates non-assessment. (See, e.g., Pet'r Reply Br. at 2.) Comparing the seven property record cards of the properties Convention HQ agrees were assessed to those of the 55 properties it claims were not shows the absence of sketches is inconsequential. Although some property record cards contained sketches of pre-existing improvements, none had sketches of the incomplete improvements, and all but one of the purportedly non-assessed properties lacked sketches of the newly built improvements. (Compare Exs. P-1 to P-11 and Exs. P-13 to P-61 with Ex. P-12.) Moreover, the Guidelines do not require assessing officials to include sketches of incomplete commercial structures on property record cards. See 2002 Guidelines, Bk. 2, Ch. 6 at 5, 28-31; 2011 Guidelines, Ch. 6 at 5, 30-33. Consequently, Convention HQ's arguments concerning the lack of sketches on the property record cards are not persuasive.

### (c) Notes

Convention HQ claims that the dearth of notes on the property record cards proves that the properties were not assessed. (See, e.g., Oral Arg. Tr. at 41-42.)

Alternatively, Convention HQ claims the notes inscribed on the property record cards show the assessments were unlawful because they were either triggered by an unauthorized subjective threshold or did not align with the percentages of completion. (See Pet'r Br. at 24-25; Pet'r Reply Br. at 20 n.5.)  Convention HQ's arguments are unpersuasive for several reasons.

*Few Written Notes*

To begin with, the Guidelines do not require assessing officials to document very much information in the memorandum section of a property record card.  See 2002 Guidelines, Bk. 2, Ch. 6; 2011 Guidelines, Ch. 6.  In fact, the Guidelines only require assessing officials to enter information in the memorandum section regarding a structure's "weighted age."  See 2002 Guidelines, Bk. 2, Ch. 6 at 56; 2011 Guidelines, Ch. 6 at 55.  The Guidelines state that when an addition is built after the construction of the principal or original structure, the improvement must have a "'weighted' age" calculated for its use in place of its actual age when using the commercial depreciation tables.  See 2002 Guidelines, Bk. 2, Glossary at 22; 2011 Guidelines, Glossary at 25.  Here, no evidence was presented to suggest that the unfinished properties were anything other than principal or original structures.  Thus, the Assessor could exercise discretion in deciding what, if any, information was to be included in the memorandum section of the property record cards.  (See also, e.g., Trial Tr. Vol. 1 at 140-42 and Ex. P-43C; Trial Tr. Vol. 3 at 74-75 and Ex. R-98 (collectively indicating that the Assessor had the authority to decide whether the notes would be publicly available on the property record cards or kept privately within the CAMA system)).)  In light of this, a lack of notes on property record cards is irrelevant and thus not persuasive.

*Unauthorized Thresholds*

Convention HQ further claims that the Assessor intentionally failed to assess most under-construction improvements because he used unauthorized subjective thresholds to trigger an assessment.  (See Pet'r Br. at 24-25.)  Convention HQ maintains that the Assessor initiated assessments based on thresholds in the notations written on four of the property record cards stating respectively "not yet," "25%," "35%," and "50%."  (See Pet'r Br. at 24-25 (citing Ex. P-32C; Ex. P-38C; Ex. P-44C; Ex. P-46C).)  There is, however, much more on each of the four notes:

> (1) "Permits, field checked not yet 25% complete 02/27/14 see photos, return before 3/1/15" (created by WPIERCE on 3/5/2014);
>
> (2) "Field checked permits, old improvements removed, new construction underway, not yet 25% see photos, return for 16p17" (created by JHILL on 4/25/2016);
>
> (3) "Permits, new 85000 sq ft four story building work in progress, not yet 35% complete, removed old building, changed use code, see photos, return for 13p14" (created by WPIERCE on 4/10/12); and
>
> (4) "Permits, work in progress, not yet 50% 12p13, return for 13p14" (created by WPIERCE on 5/31/12).

(Ex. P-32C; Ex. P-38C; Ex. P-44C; Ex. P-46C.)

The notes did use abbreviated language, but they conveyed straightforward meanings that described assessing officials' observations made during site visits. Uncontested trial evidence corroborates this explanation.  For example, Mr. Hill undeniably authored one of the notes, and the remaining three were penned by William Pierce, a former employee of the Assessor's office who worked with Mr. Hill.  (See Ex. P-32C; Ex. P-38C; Ex. P-44C; Ex. P-46C.)  (See also Trial Tr. Vol. 1 at 140-42; Ex. P-

43C; Trial Tr. Vol. 2 50-51.) Leveraging his experience, Mr. Hill clarified that the three notes written by Mr. Pierce signified his colleague's estimate that the value of the improvements was zero. (See Trial Tr. Vol. 2 at 51.) He added that Mr. Pierce intended to revisit, monitor, and gauge the progress of the construction on the subsequent assessment date. (See Trial Tr. Vol. 2 at 51.) (See also Trial Tr. Vol. 2 at 24-25, 231-32 (explaining that site visits were conducted more than once a year when a property was under construction).) Mr. Hill's testimony is credible regarding these notes, given his authorship of one and his familiarity with the author of the others. Thus, the Assessor did not improperly rely on "unauthorized" or "unlawful" thresholds, but instead, properly relied on contemporaneous information from the personal observations of experienced assessing officials to initiate assessments.

*Aligning Completion Percentages With Values*

Convention HQ alternatively claims that the Assessor intentionally failed to assess the under-construction properties by disregarding known completion percentages reflected in some of the notes and assigning them zero-dollar values. (See Pet'r Reply Br. at 20 n.5; Oral Arg. Tr. at 52-56.) In support of this claim, Convention HQ again focuses on small snippets of each note (i.e., "bldg. not 50% complete[,]" "35% complete for 16p17[,]" and "roughly 40% complete,") rather than the notes in their entirety. (See Pet'r Reply Br. at 20 n.5 (citing Ex. P-29C; Ex. P-47C; Ex. P-55C).) The full notes are as follows:

(1) "Field checked, bldg. not 50% complete 1/17, return to inspect on completion, likely 18p19[,] see photos[;]"

(2) "Field checked permits, new 10 story Cummins Distribution HQ, opening fall of 2016, 35% complete for 16p17, return when complete[;]"

30

(3) "Field checked permits, Phase II Artistry Apartments roughly 40% complete, see photos, return 16p17[.]"

(Ex. P-29C; Ex. P-47C; Ex. P-55C.)  In addition, nearly 20 other properties have similar notes.  (See Ex. R-24; Ex. R-60; Ex. R-98.)

Indiana law mandates that all real property, whether complete or incomplete, must be assessed as it stands on the specified assessment date.  See, e.g., Stark v. Kreyling, 188 N.E. 680, 681 (Ind. 1934) (providing that "only the facts as they exist on the [annual assessment date] of each year are material to the determination of questions of assessment and valuation of property for purposes of taxation").  Therefore, comparing the statutory assessment date to the date each note was written is crucial to determining whether the Assessor intentionally failed to assess most of the under-construction properties.

With these principles in mind, the notes do not establish that the Assessor failed to assess the incomplete improvements or used arbitrary methodologies to estimate their value for the following reasons.  First,  the alleged completion percentage dates do not align with any of the relevant assessment dates or the construction dates of the improvements, rendering them incapable of proving a failure to assess.  (See, e.g., Ex. R-24 at 266 and Ex. R-98 at 3121 (evaluating an improvement's completion percentage months before or after the stipulated assessment and construction dates); Second Stip. at 2, 4.)  Similarly, the dates the notes were written do not coincide with any of the relevant assessment dates.  (Compare, e.g., Ex. P-29C and Ex. P-55C with Second Stip. at 3, 5.)  Moreover, the content of the notes does not provide evidence of most of the improvements' completion percentages.  (See, e.g., Ex. P-29C; Ex. P-55C; Ex. R-24

31

at 262.)  And finally, as previously mentioned, the photographic evidence fails to reflect the appearance of the unfinished improvements' interiors and exteriors on specific assessment dates.

Most of the under-construction properties were assessed based on their specified percentages of completion.  (See, e.g., Ex. R-42; Ex. R-60.)  At best, only two under-construction properties were assessed inconsistently with their percentages of completion, which reasonably suggests that an error was made rather than an intentional non-assessment.[23]  (See Ex. P-43C; Ex. P-47C (each appearing to provide an improvement's completion percentage for a relevant assessment date).)  As a result, the notes do not show that the Assessor intentionally failed to appraise, estimate the value, or assess any of the 62 Stipulated Properties.

### (d)  Pre- and Post-Construction Changes

Convention HQ also alleges that the absence of a change to property record cards before construction began as compared to after it started indicates that 55 of the 62 Stipulated Properties were not assessed.  (See Pet'r Br. at 19.)  Convention HQ maintains that there should have been some type of modification to the property record cards during the course of construction, such as updating the property class codes to reflect the addition of new structures or removing pre-existing improvements from the property record cards.  (See Oral Arg. Tr. at 42-43.)

As an initial matter, however, Convention HQ has not provided evidence of specific changes that should have been, but were not, implemented.  Moreover,

---

[23]  In fact, during the trial, the Assessor admitted that the use, wall, and framing types would have been apparent in 2006 for the improvement on Parcel 1104041, but it was mistakenly valued at zero dollars.  (See Trial Tr. Vol. 2 at 45-49; Ex. P-62 at ¶¶ 13-15.)

32

Convention HQ has not provided any assessment-related authority, either binding or persuasive, that requires changes to be made. That said, the property record cards presented as evidence[24] contradict Convention HQ's claim because they clearly show that numerous changes were made before construction was completed. (See Exs. P-1 to P-61; Exs. R-29 to R-89.) These changes include: (1) removing pre-existing improvements, (2) adding new improvements, (3) updating the assessed values of either the pre-existing improvements or the land, (4) changing the total number of pages within a property record card, and (5) updating the property class codes. (See, e.g., Ex. P-4A; Ex. P-6A; Ex. P-19A; Ex. P-22A; Ex. P-30; Ex. P-33A; Ex. P-38A; Ex. P-42A; Ex. P-56A.) Furthermore, during the trial, Mr. Deaton explained that property class codes typically were not changed during the early stages of construction unless absolutely necessary. (See Trial Tr. Vol. 3 at 25-27.) He stated that a change would be warranted if updating a property from an industrial to a commercial property class code impacted the value of the land. (See Trial Tr. Vol. 3 at 26-27.) Given this evidence, Convention HQ has not demonstrated that the absence of changes to property record cards before and after construction begins means the Assessor did not appraise or estimate the value of most of the under-construction properties, thus, failing to assess them.

Here, Convention HQ has attempted to weave a web of circumstantial evidence, much that was neither probative nor persuasive, in support of its claim that the Assessor failed to assess most of the 62 Stipulated Properties. As explained, the assessment of

---

[24] The evidence does not include pre-construction property record cards for the following 22 properties: 1007123, 1008636, 1019816, 1026470, 1038992, 1039716, 1055259, 1071550, 1074448, 1080571, 1081586, 1103808, 1104041, 1104560, 1105574, 1105869, 1105870, 2014382, 4044981, 6003538, 7046028, and 9011580. (See Exs. P-1 to P-61; Exs. R-29 to R-89.)

properties requires performing the official acts of discovering, listing, and appraising properties, but Convention HQ has not met its burden to provide evidence that the Assessor failed to list and appraise the under-construction properties. Therefore, for the reasons stated above, the Court finds that Convention HQ has not shown the Assessor failed to assess most of the 62 Stipulated Properties at issue.

### 3. Retroactive Assessments

Finally, as an alternative argument, Convention HQ asserts that the Assessor should have used his authority to retroactively assess several of the under-construction improvements because the zero-dollar values originally assigned to them were "understated." (See Pet'r Reply Br. at 7-8; Oral Arg. Tr. at 38-41.) Convention HQ explains that the original valuations of 55 of the 62 Stipulated Properties were understated because the Assessor did not have sufficient information at the time of the assessment, which he subsequently obtained. (See Pet'r Reply Br. at 7-8.) In these circumstances, Convention HQ asserts that the Assessor's failure to retroactively assess unfinished improvements for tax years when information was unavailable constitutes a failure to assess them at all. (See Oral Arg. Tr. at 38-41.)

Indiana Code Section 6-1.1-9 et seq. governs the retroactive assessment of real property. See IND. CODE §§ 6-1.1-9-1 to -10 (2024). Under this statutory regime, assessing officials have specific responsibilities triggered by their belief that "any taxable tangible property has been omitted from or undervalued on the assessment rolls or the tax duplicates for any year or years[.]" See I.C. § 6-1.1-9-1. If such a situation arises, an assessing official may reassess a property or increase its assessment for a prior year only if notice is given to the taxpayer as required by Indiana Code Section 6-

34

1.1-9-1 within three years after the assessment date for that prior tax year. See I.C. §
6-1.1-9-4(a).

Convention HQ's retroactive assessment argument assumes that if an unfinished improvement valued at zero dollars on an assessment date is nearly or fully completed just a few months later, it must have been originally undervalued or omitted from the assessment rolls. The law, however, is clear that real property must be assessed based on its condition on the specific assessment date. See Stark, 188 N.E. at 681. As stated above, Convention HQ did not provide evidence that the assessments of the under-construction improvements did not accurately reflect their physical conditions on the relevant assessment dates. Furthermore, Convention HQ failed to prove that the Assessor was required to perform retroactive reassessments for 55 of the 62 Stipulated Properties because it did not present any market-based evidence showing that the original assessments were understated. (See Trial Tr. Vols. 1 to 3.) See also, e.g., Jones, 51 N.E.3d at 463-64 (providing that litigants must present market-based, objective evidence that indicates an assessment is not an accurate reflection of a property's market value-in-use). Finally, Convention HQ did not demonstrate that retroactive assessments of under-construction improvements were required because it failed to submit the relevant assessment rolls into evidence to show that tangible property has been omitted from or undervalued on the assessment rolls or tax duplicates for the relevant years.

**CONCLUSION**

For all the reasons set forth above, Convention HQ has not met its burden to prove the Assessor failed to assess most of the 62 Stipulated Properties in Marion

County during the 2006 through 2019 tax years. It follows therefore that Convention HQ has not shown that the Assessor treated its under-construction property differently than other commercial properties under construction in Marion County during those years. Accordingly, in the absence of disparate treatment, the Court does not reach Convention HQ's claims that the Assessor violated its federal and state constitutionally guaranteed rights to equal protection, due process, uniformity and equality in assessment and taxation, and equal privileges and immunities.